# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK
_____

HENRY W. SARKIS,

                                    Plaintiff,

          -vs-                                                  DECISION AND ORDER

OLLIE'S BARGAIN OUTLET,                                         10-CV-6382 CJS

                                    Defendant.
_____

## APPEARANCES

For Plaintiff:            Christina A. Agola, Esq.
                          Ryan Woodworth, Esq.
                          Christina A. Agola, PLLC
                          1415 Monroe Avenue
                          Brighton, New York 14618

For Defendant:            Stephen J. Jones, Esq.
                          Joseph A. Carello, Esq.
                          Nixon Peabody LLP
                          1300 Clinton Square
                          Rochester, New York 14604

## INTRODUCTION

This is an action alleging employment discrimination and retaliation, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII), as amended, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981 ("Section 1981") and the New York Human Rights Law ("NYHRL"), Executive Law § 290 *et seq.* Now before the Court is Defendant's motion [#14] for summary judgment. The application is granted.

BACKGROUND

Unless otherwise noted, the following are the undisputed facts of this case, viewed in the light most-favorable to Plaintiff.  Henry Sarkis ("Plaintiff") is a naturalized U.S. citizen who was born in Lebanon.  Plaintiff speaks fluent English with an accent.  Plaintiff was employed by Ollie's Bargain Outlet ("Defendant") for a period of approximately sixteen months, from September 7, 2007 until December 23, 2008, when Defendant terminated his employment.

Plaintiff was hired by Scott Osborne ("Osborne"), Defendant's regional manager, to work in Defendant's store located in Greece, New York.  On or about March 2, 2008, Osborne and Defendant's District Manager, David Pepe ("Pepe"), promoted Plaintiff to Store Manager of the Greece location.  In that position, Plaintiff reported directly to Pepe.  Pepe's district included eleven stores throughout Pennsylvania, Ohio and New York.  Pepe Aff. ¶ 1.  As manager of Defendant's Greece store, Plaintiff was responsible for enforcing Defendant's policies, and had authority to hire and discipline employees.  Plaintiff also had authority to fire employees, with the approval of Defendant's Human Resources Office.  In that regard, Plaintiff worked directly with Human Resources Specialist Susanna Carnecchia ("Carnecchia").

Upon being hired, Plaintiff was provided with a copy of Defendant's Training Manuals.  *See*, Docket No. [#14-4].  Defendant's "EEO" policy states that the company "prohibits discrimination" on the basis of, *inter alia*, sex, race and national origin, and that violation of that policy will result in disciplinary action "up to and including immediate termination."  *Id*. at p. 45.  Defendant's "no harassment" policy further states:

**If you have any concern that our No Harassment policy may have been violated by anyone, you must immediately report the matter. Due to the very serious nature of harassment, discrimination and retaliation, you must report your concerns to one of the individuals listed below:**

1. First, discuss any concern with your Store Team Leader [manager] if you are a store associate or with your Departmental Manager if you are a Support Center [sic] or supervisor if you are a Distribution Center associate.

2. If you are not satisfied after you talk with the Manager/Supervisor listed above, or if you feel that you cannot talk to the Manager listed above, you should discuss your concern with your District Team Leader, Manager or the Vice President of Human Resources.

3. If you are not satisfied after you have talked with the Vice President of Human Resources, of if you feel you cannot talk to the Vice President of Human Resources, you should speak to the Chief Operating Officer.

4. If at any time, you feel the need to speak to other members of management, you may contact the President.

**You should report any actions that you believe may violate our policy no matter how slight the actions may seem.**

Docket No. [#14-4] at p. 48 (emphasis in original). Defendant also had an anti-harassment "open door policy" that allowed employees to take their concerns directly to the company's Chief Operating Officer or President. *Id*. at p. 50.

Defendant's stores were required to have periodic Loss Prevention Audits. *See*, Docket [#14-4] at pp. 51-52. "A loss prevention audit is a periodic review of an Ollie's store, which grades the Store Team Leader's performance in several areas, including receiving, cash office/cash registers, personnel, safety, and loss prevention/physical security." Stayer Aff. [#14-7] ¶ 9. Such audits were scored, and the Store Manager was

required to score at least 90% to avoid disciplinary counseling. *Id*.1  According to the

loss prevention policy, store managers who failed their audits were subject to a

progressive disciplinary procedure, beginning with a verbal counseling, then written

counselings, with the third and fourth counselings possibly resulting in termination of the

store manager's employment. *Id*.

Defendant's stores were also required to have periodic Safety Audits, which were

generally performed at or around the same time as the Loss Prevention Audits.  "A Safety

Audit is a periodic survey of each store to determine if various aspects of the store abide

by certain health and safety requirements." Pl. Resp. to Def. Stmt. of Facts [#20-2] ¶  18.

Defendant's stores were also required to periodically have Inventory Prep Walks, to

determine whether inventory was properly counted and displayed. Pl. Resp. to Def. Stmt.

of Facts [#20-2]  ¶¶ 30-31.

Loss Prevention Audits, Safety Audits and Inventory Prep Walks were generally

conducted by Defendant's District Loss Prevention Manager, James Stayer ("Stayer").

Stayer, though, did not have any authority to discipline employees, including Plaintiff.

*See*, Pl. Resp. to Def. Stmt. of Facts [#20-2] ¶ 14.  Instead, Stayer reported the results of

his audits to Pepe, who would then consult with Defendant's Human Resources office "to

determine proper corrective action and/or disciplinary measures." *Id*.

During Plaintiff's first three months as a store manager, he failed his Loss

Prevention Audits.  Specifically, in March 2008, April 2008 and June 2008, Plaintiff

---

1At deposition, Plaintiff stated that he was "not sure" what a passing score was, but he thought that it
might be 80%.  Pl. Dep. at 54.  Plaintiff now concedes that a passing score was 90% or above. *See*, Pl.
Resp. to Def. Stmt. of Facts ¶ 15.

received the following failing scores, respectively, on his Loss Prevention Audits: 82%, 88% and 78%. Docket No. [#14-4] at p. 65.  In those same months, Safety Audits of Plaintiff's store found "repeated issues with keeping aisle ways clear, keeping merchandise clear of fire sprinkler heads, and [keeping merchandise] safely stack[ed]." Pl. Resp. to Def. Stmt. of Facts ¶ 19.  Moreover, in June 2008, an Inventory Prep Walk at Plaintiff's store revealed "uncounted inventory, [a] cluttered sales floor, and unstocked merchandise littered throughout the store." Pl. Resp. to Def. Stmt. of Facts ¶ 31.

In June 2008, Carnecchia received a report that a female employee at Plaintiff's store, Ava Rodriguez ("Rodriguez"), was complaining of sexual harassment by one of Plaintiff's male store employees, Alfredo Caccamise ("Alfredo").  Carnecchia and Stayer contend that Rodriguez made the Complaint directly to Stayer, who reported it to Carnecchia.  However, Plaintiff contends that he is the person to whom Rodriguez complained, and that he forwarded her complaint to Stayer. *See*, Pl. Aff. at ¶¶ 18-19. Plaintiff also contends that Stayer accused him of fabricating the complaint. *Id*. at ¶ 20; Pl. Appendix I, Ex. A, Pl. Dep. at p. 148.  In any event, Carnecchia maintains that Defendant investigated Rodriguez's complaint and took "effective remedial action with respect to the alleged harasser," and it does not appear that Plaintiff has any personal knowledge or evidence to the contrary. Pl. Resp. to Def. Stmt. Of Facts [#20-2] ¶ 35.

On or about July 14, 2008, Plaintiff failed his fourth consecutive Loss Prevention Audit, with a score of 63.5%. *See*, Docket No. [#14-4] at p. 65.[2]  Additionally, a Safety

2 As discussed below, Plaintiff has not produced any evidentiary proof in admissible form to contest the accuracy of any of the audits, including this one.  In his affidavit submitted in opposition to Defendant's summary judgment motion, Plaintiff states that he "allegedly" failed the July Loss Prevention Audit, while "other similarly situated stores" were not written up "for the very same things" that were cited in his audit.

(continued...)

Audit conducted on July 15, 2008, found continuing problems "with keeping aisle ways clear, keeping merchandise clear of fire sprinkler heads and [keeping merchandise safely stacked]." Pl. Resp. to Def. Stmt. of Facts [#20-2] ¶ 19.

On July 24, 2008, Pepe issued Plaintiff a written warning for falsely indicating that he had performed a Daily Safety Scan at the Greece store on June 24, 2008. Docket No. [#14-4] at p. 56. In that regard, on June 24, 2008, Stayer was performing a Loss Prevention Audit at Plaintiff's store, and noticed that Plaintiff had not performed the required Daily Safety Scan ("DSS"), which required him to inspect the store for safety issues prior to opening to the public. The parties agree that Plaintiff was required to perform the DSS before he opened the store. Stayer maintains that Plaintiff did not perform the DSS before opening the store, and that after Stayer mentioned this omission to Plaintiff, Plaintiff responded that it was then too late to perform the scan, since the store was already open, but Stayer told him that he needed to do it anyway. According to Stayer, he then observed Plaintiff completing the DSS form and falsely indicating that he had performed the inspection. This prompted Stayer to check the store's surveillance videos from prior days, which showed that Plaintiff had also failed to perform the DSS on those days. Stayer reported those findings to Pepe, who issued Plaintiff a written warning. *See*, Stayer Aff. [#14-8] at p. 41. Plaintiff admits that on June 24, 2008, he completed the DSS report at Stayer's prompting, but denies that it was false, because he "believes" that he had in fact performed the inspection prior to writing up the report. Sarkis Dep. [#14-2] at pp. 101-102. Plaintiff also maintains that the information on the

_____

(...continued)

However, as discussed further below, Plaintiff has not come forward with admissible proof to suggest that the audit was inaccurate, and he admitted at his deposition that he had no evidence that other store managers were treated differently than him. See, Pl. Dep. at p. 137-139, 143, 147-149, 176-177.

June 24th DSS report was accurate.  However, Plaintiff does not specifically controvert Stayer's contention that Plaintiff had failed to perform the DSS on previous days. *See*, Pl. Resp. to Def. Stmt. of Facts ¶ 21.  In fact, at his deposition Plaintiff admitted that he had not performed the DSS on an undetermined number of days, in violation of company policy. Sarkis Dep. [#14-2] at p. 88.

Also on July 24, 2008, Pepe placed Plaintiff on a 90-day performance improvement plan ("PIP").  Docket No. [#14-4] at p.54 (entitled "Action Plan").  The parties agree that Plaintiff was placed on the PIP "[d]ue to the fact that his store had failed four consecutive Loss Prevention Audits[.]" Pl. Resp. to Def. Stmt. of Facts [#20-2] ¶ 16.

On or about September 23, 2008, Plaintiff claims to have "reported to management a rumor that was made in the workplace" that Alfredo and Pepe were "deliberately trying to have [him] terminated." Sarkis  Aff. [#20-1] at ¶ 25.  Such rumor is not evidentiary proof in admissible form.  Moreover, the record does not indicate where Plaintiff allegedly heard this rumor, or why Alfredo and Pepe were allegedly trying to have him fired. *See*, Sarkis Aff. at ¶ 25.

On or about October 17, 2008, Pepe issued Plaintiff another written counseling, for allowing a newly-hired employee to open and/or close the store before performing a credit and criminal background check. Docket [#14-4] at p. 58.  In that regard, Pepe stated that Plaintiff had disobeyed him by allowing the employee to open/close the store before Pepe had a chance to interview the employee. *Id*.  Pepe's written warning was based on a report by Stayer, who indicated that on October 8, 2008, while performing a Loss Prevention Audit at Plaintiff's store, he learned that Plaintiff had hired a new

employee, Ashley Strain ("Strain"), and had given her keys to the store, even though he had not performed the required credit and background check. Stayer Aff. [#14-9] at p. 13. Stayer further indicated that Plaintiff had given Strain the pass code for the store's alarm system, and had lied to him about the circumstances under which Strain was given the pass code. Stayer also indicated that based on his investigation, Plaintiff had lied to him by telling him that Strain had not been allowed to open or close the store by herself, when in fact the records indicated that Strain had opened or closed the store by herself on eight occasions. Stayer Aff. [#14-9] at p. 14. According to Pepe, despite this warning, the very next day, October 18, 2008, Plaintiff hired another "key carrier" employee, and allowed her to begin working, without first running the required credit and criminal background check. Pepe Aff. at ¶ 13; Stayer Aff. [#14-9] at p. 16. In response to those contentions, Plaintiff disputes that he hired Strain without Pepe's permission, and contends that Pepe verbally gave him permission to let Strain begin working before her background check was complete because the store was short-handed. *See*, Pl. Resp. to Def. Stmt. of Facts [#20-2] ¶¶ 11, 22. However, Plaintiff does not specifically controvert Defendant's contention that Strain was improperly given a key to the store, or that he lied about letting Strain open and close the store by herself. *See, e.g.*, Pl. Resp. to Def. Stmt. of Facts ¶ 23. Plaintiff contends, though, that his assistant manager gave a key to Strain without his knowledge. *See*, Pl. Dep. At p. 98 ("I wasn't the one who gave her the keys. . . . I had no knowledge of what happened that day. . . . I'm not sure what happened. But it was not authorized."). On the other hand, Plaintiff admits that he instructed the assistant manager to provide Strain with the code to disarm the store's security system. Pl. Resp. to Def. Stmt. of Facts at ¶ 23.

On October 23, 2008, Pepe conducted an audit of Plaintiff's store and cited numerous problems. Docket No. [#14-4] at pp. 60-62. The audit noted that Plaintiff's store's performance was 25% below the sales plan, and $31,000.00 below planned profit. *Id*. at 60. Under the category of "Customer Experience," Pepe found that the store earned only 22 points out of 50 possible points. *Id*. Under the category "Operations/Loss Prevention," Pepe found that the store earned 22 points out of 38 possible points. *Id*. at 61. The audit also noted that Plaintiff's last Loss Prevention Audit score was below 90%. *Id*. at 62. Overall, Plaintiff needed a 90% score to pass the audit, but he only scored 44%. Pepe Aff. ¶ 14. Plaintiff agrees that he scored only 44% on the audit. Pl. Resp. to Def. Stmt. of Facts [#20-2] ¶ 25.

Almost immediately after failing this last audit, on October 27, 2008, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). Sarkis Dep. [#14-2] at 175; Pl. Appendix 1, Ex. B. The complaint asserted, at the outset, that Plaintiff had been employed by Defendant for "nearly one year with no discipline of any nature."[3] The Complaint then described the alleged verbal and text-message harassment by Alfredo, but failed to allege any comment by Stayer. Next, the complaint recited the incident involving Plaintiff's alleged report of harassment against Rodriguez. The complaint then indicated that after reporting such harassment, Plaintiff received a failing

---

3*See also, id*. at p. 2 ("I had a **stellar** work record during my tenure with the defendant **prior to my opposition and engagement in a sexual harassment complaint**, as well as my complaints to management about the hostile environment I perceived on the basis of my nationality and race.") The portion of EEOC complaint highlighted in bold text is misleading because Plaintiff had already failed multiple Loss Prevention Audits prior to allegedly reporting the harassment against Rodriguez. The underlined portion of the text is misleading because, as Plaintiff now admits, he never complained to anyone in Defendant's management about an alleged *hostile environment*. Instead, at most he claims that he told Stayer about the lone "I kill u" text message from Alfredo.

grade on his next Loss Prevention Audit, along with several other disciplinary write-ups, which he alleged were retaliatory. The EEOC complaint failed to mention, though, that Plaintiff had already received several consecutive failing audit grades before the Rodriguez incident, thereby making it appear that the discipline received after the Rodriguez complaint was retaliatory. Although it does not affect the Court's ruling herein, the Court points out this fact since, in that regard, the EEOC complaint, which was notarized by Plaintiff's attorney Christina A. Agola, appears to have been drafted in an intentionally misleading manner, since it suggests that Plaintiff was a model employee prior to reporting the incident involving Rodriguez, and that thereafter he suddenly began receiving bad reviews, which is clearly not true. Furthermore, the EEOC complaint alleged that Plaintiff was singled out for disciplinary treatment while other similarly situated store managers were not disciplined, even though Plaintiff now admits that he has no evidence of such disparate treatment.

On November 17, 2008, Plaintiff's store failed another Loss Prevention audit, this time with a score of 63.5%. Pl. Resp. to Def. Stmt. Of Facts [#20-2] ¶ 17. The same day, a Safety Audit found continuing failures to keep aisles and fire sprinklers clear and merchandise safely stacked. *Id*. at ¶ 19.

On November 26, 2008, Pepe issued Plaintiff a "Final Written Warning." Docket No. [#14-4] at p. 65. According to Pepe, he issued the final warning because Plaintiff's store had failed four consecutive loss prevention audits. Pepe Aff. at ¶ 11. The warning indicated, among other things, that Paintiff's store had numerous Loss Prevention scores below 90%, as follows: March 27, 2008 - 82%; April 29, 2008 - 88%; June 24, 2008 - 78%; July 15, 2008 - 63.5%; October 8, 2008 - 81%; and November 17, 2008 - 63.5%.

Docket No. [#14-4] at p. 65. The Final Warning indicated that Plaintiff would be terminated if there were "any other issues of failure to follow and meet company policy, procedure and standards." *Id*. Plaintiff does not dispute that the final warning was issued in connection with his "continued poor performance." Pl. Resp. to Def. Stmt. of Facts [#20-2] ¶ 26.

On November 30, 2008, Pepe issued Plaintiff another written warning, this time for exceeding his weekly payroll budget. Docket No. [#14-4] at p. 67. Plaintiff does not dispute that he exceeded the budget. Pl. Resp. to Def. Stmt. of Facts [#20-2] ¶ 27.[4]

On December 9, 2008, Pepe issued Plaintiff another written warning, for violating Defendant's policy by leaving the store early during a special sales event, without obtaining permission from Pepe. *Id*. at p. 69.[5] Plaintiff agrees that he left the store early, but maintains that he was not aware that he needed permission to do so. Pl. Resp. to Def. Stmt. of Facts [#20-2] ¶¶ 11, 29.

On December 22, 2008, Sean Trepiccione ("Trepiccione"), a District Loss Prevention Manager from a neighboring district, was filling in for Stayer. That day, Trepiccione conducted an Inventory Prep Walk at Plaintiff's store and found numerous problems, including thirty-two pallets of merchandise stacked and stored throughout the store, which posed a safety hazard to customers and prevented other merchandise from

---

[4] Plaintiff admits that his store exceeded the payroll, but he blames that on his assistant manager, Larry, who he claims deleted an email about payroll before Plaintiff had a chance to read it. Pl. Dep. [#14-2] at p. 109.

[5] Plaintiff signed the warning under protest, and indicated that the "rules [were] not applied to anyone at Ollie's but [him]," and that he was being retaliated against. *Id*. Plaintiff now concedes, though, that he has no evidence that any other employee was treated differently than him.

being displayed. Pl. Resp. to Def. Stmt. Of Facts [#20-2] ¶ 32.  Trepiccione also found "expensive electronic merchandise was not stored in a secured location [as required by] company policy, which caused an increased chance of theft." *Id*.[6]  Trepiccione reported those findings to Pepe.  Plaintiff agrees that Trepiccione's report was accurate. Pl. Resp. to Def. Stmt. of Facts [#20-2] ¶ 32.

On December 23, 2008, Pepe terminated Plaintiff's employment.  According to Pepe, he and Osborne jointly made the decision to terminate Plaintiff's employment. Pepe Aff. at [#14-3] ¶ 19.  Pepe further states that, on December 24, 2008, the day after Plaintiff was fired, the Town of Greece  Fire Marshall issued a store safety violation to the Greece store, due to Plaintiff's failure to follow store procedures. *Id*. at ¶ 20.  Osborne agrees that he and Pepe decided to terminate Plaintiff's employment because of his "continued unsatisfactory performance . . . despite multiple warnings and opportunities to improve." Osborne Aff. [#14-10] ¶ 7.

Pepe denies that he singled-out Plaintiff for unfavorable treatment.  In that regard, Pepe maintains that Plaintiff's loss prevention audit scores were the lowest of any store manager in Pepe's district. Pepe Aff. [#14-3] at ¶ 22.  Pepe also contends that in 2008 he disciplined two other store managers who were having performance problems similar to Plaintiff's. *Id*. at ¶ 23.  Specifically, on February 27, 2008, Pepe fired Jeff Naylor

---

[6]*See also*, Trepiccione Aff. [#14-11]  ¶ 5 ("During my inventory prep walk of Store #59, I discovered: (1) thirty-two pallets of merchandise  stacked and stored in various aisles of the carpet section of the store, which caused a significant safety hazard to customers and prevented carpet from being displayed, and (2) expensive electronic merchandise was not stored in a secured location pursuant to company policy, which caused an increased possibility of theft.  I reported the results of my inventory prep walk of Plaintiff's store to Mr. Stayer and Plaintiff's District Team Leader David Pepe.").

("Naylor"), the manager of the Henrietta, New York, store, after Naylor failed several loss prevention audits, *id*. at ¶ 24, and on October 29, 2008, another manager, David Kempf ("Kempf"), resigned rather than being fired by Pepe, after he earned a loss prevention audit score of 39%. *Id*. at ¶ 25. Both Naylor and Kempf were "caucasians" with unknown ethnic backgrounds. Carnecchia Aff. [#14-5] ¶ 11. Plaintiff does not dispute that Naylor and Kempf were subject to such discipline. Pl. Resp. to Def. Stmt. of Facts [#20-2] ¶34.

On December 29, 2008, Plaintiff filed a second EEOC complaint, alleging that the termination of his employment was retaliatory. Docket [#20-4], Pl. Appx. I, Ex. C. The EEOC subsequently issued "right to sue" letters as to both of Plaintiff's EEOC complaints. *Id*., Exs. D & E.

On July 6, 2010, Plaintiff commenced this action. The Complaint purports to state claims for hostile-environment employment discrimination,[7] based on Plaintiff's race, "Arab," and national origin, Lebanese, and retaliation. These claims are asserted pursuant to Title VII, Section 1981 and the NYHRL.

On October 20, 2011, Defendant deposed Plaintiff. *See*, Jones Aff. [#14-2]. Plaintiff testified that he was aware of Defendant's anti-harassment policies, and that Defendant had a "zero tolerance" policy for harassment, along with an open-door policy for reporting harassment. Sarkis Dep. [#14-2] at 32-34. Plaintiff further indicated that as Store Manager, he had authority to "stop" harassment by his subordinates at his store. *Id*.

---

[7]At oral argument of Defendant's summary judgment motion, Plaintiff's attorney affirmed that Plaintiff is not asserting a disparate treatment claim. In any event, it is evident from Plaintiff's deposition that he has no evidentiary proof in admissible form that any similarly situated non-Arab/Lebanese store manager was treated more favorably than him. *See*, Pl. Dep. [#14-2] at 137-139, 143, 147-148, 176-177.

at 35.  Nevertheless, Plaintiff contends that his subordinate, Alfredo Caccamise, "mocked and taunted" him on a daily basis because of Plaintiff's race/national origin. *Id*. at 37-39. Plaintiff described that harassment as follows:

> Q. What specifically did he say?
>
> A. [He] makes fun of – makes fun of what you see on TV most of the time. He makes this funny sound like an Indian, "la la la," you know?  'Praise Allah' and do all kind of stuff.
>
> Q. So he would do some type of chant, 'la, la, la,' and he would say, 'Praise Allah'?
>
> A. Yes.  And make fun of my accent.  . . .  He also made fun of the fact we're all camels and towel heads[.]

*Id*. at p. 39-40.  Plaintiff also contends that on one occasion, Alfredo sent him a text message stating "I Kill U," "making fun of the way we talk." *Id*. at 41.  In that regard, Plaintiff contends that Alfredo was referencing a line from an act by ventriloquist Jeff Dunham, who uses a marionette called "Achmed the Dead Terrorist," who frequently states, "I kill You!"  At deposition, Plaintiff testified:

> A. Um, he's got a character called Achmed the Terrorist, and he says, every time I looked at him, 'I kill you.'
>
> Q. Did you find that funny, that part of the ventriloquist act?
>
> A. I — yes.
>
> Q. Did you find it offensive in any way?
>
> A. In a way, the way they make fun of things.  It's funny when he say about – when it comes down to it, it's — it's not the true thing.

14

Q. Do you recall ever having discussions with Alfredo about that ventriloquist act?

A. I don't remember.

*Id*. at 45. Oddly, although Plaintiff understood that Alfredo was referencing the aforementioned comedy act, Plaintiff nevertheless claims that he considered Alfredo's text to be a "very serious threat," since Alfredo allegedly claimed to be a member of the "Mafia." *Id*. at 92.

Plaintiff contends that he told Stayer about the "I Kill U" text message, but never told Stayer or anyone else about the alleged daily harassment by Alfredo. Pl. Dep. at pp. 41. Plaintiff states that when he showed Stayer the text message, Stayer laughed. *Id*. at 46. Plaintiff, though, does not indicate that he told Stayer that he felt the text message was discriminatory with regard to his race or national origin:

Q. So What did you tell Mr. Stayer?

A. I showed him the text message. He looked at it. He laughed. I said, 'Let me put it the other way.' I said, 'What happened [sic] if I would have been the one who sent him the message? You would not think it funny, would you?' No answer [from Stayer]. I said, 'Because mine would come out as a threat. But him saying it, it's funny.' So, um, he [Stayer] didn't do nothing.

Pl. Dep. at 46. Although Plaintiff complains that Stayer "didn't do anything" about the text message, he does not claim that he asked Stayer to do anything about it. In any event, although Plaintiff now contends that Stayer was wrong for failing to take action, Plaintiff did not thereafter report the incident to anyone else. *Id*. at 46-47. When asked to explain why he did not report the incident to anyone else, such as Carnecchia, Plaintiff

responded: "Because I – at the time I started feeling a hostile environment all around. I'm not going to get the help I'm looking for." *Id*. at 47.

Plaintiff states that on another occasion, the date of which is not specified, he overheard Stayer say to Alfredo, referring to Plaintiff: "Don't piss him off. They're crazy people." Sarkis Dep. [#14-2] at 48-49.8  Plaintiff does not recall the context in which Stayer made the comment. *See, id*. at 49 ("They were talking, and I don't know how this came up.").  Plaintiff did not report Stayer's alleged comment to anyone. *Id*. at 49.

Plaintiff contends that both Stayer and Pepe were "out to get [him]." Sarkis Dep. [#14-2] at p. 125.  When asked to explain why be thought that, Plaintiff stated that Stayer and Pepe began to act negatively toward him after he reported Rodriguez's complaint that she was being harassed by Alfredo. *Id*. ("After the initial reporting to Stayer about the allegation of sexual harassment situations at the store and – have changed.  The way they were dealing with me changed.").9  Plaintiff contends that Stayer accused him of making up the information about Rodriguez. *Id*. at 148.  Plaintiff also speculates that Stayer was "out to get him" because Stayer had served in the U.S. military during the Persian Gulf War. *Id*. at 126-127 ("I'm sure he formed an idea that was completely ignorant  of the fact where I am actually from.").  Additionally, Plaintiff speculates that Pepe was "out to get him" because Pepe and Alfredo were friends, though there is no evidence in the record to support Plaintiff's suggestion that Pepe, the District Manager,

---

8 Stayer denies that he ever made the comment, "they're crazy people." Stayer Aff. ¶ 18.

9 Plaintiff contends that Rodriguez complained to him, and he forwarded the complaint to Stayer. However, Stayer maintains that Rodriguez complained to him directly. Stayer Aff. ¶ 20.

and Alfredo, a store associate, were actually friends.

With regard to the Loss Prevention Audits at Plaintiff's store, he does not dispute that the problems that were reportedly found at his store actually existed, or that he received failing scores. *See, e.g.*, Pl. Dep. at 55, 57-61 (Plaintiff repeatedly stated that he could not recall whether the audits were accurate); *see also id*. at 67 (Agreeing that the monthly safety inspection reports were accurate). In that regard, he has not offered any evidentiary proof in admissible form to challenge Defendant's contention that the reports are accurate. At most, Plaintiff suggests that some of the safety/policy violations that were identified were beyond his control. *See, e.g., id*. at p. 65-66 ("A. There were issues with the Fire Marshal if he comes in and you have your back room is over stocked. Nothing – nothing you could have done about it. Q. So there was a problem in your store in terms of merchandise being stacked in the back room? A. Yes. Q. Okay. You yourself acknowledged that was a problem, correct? A. Absolutely."); *id*. at 87 (Merchandise that was found stacked under a table was put there because there was no where else to put it). As mentioned above, Plaintiff also concedes that he failed to perform the Daily Safety Scan on an undetermined number of occasions. *Id*. at 88. With regard to the contention that Plaintiff failed to follow Defendant's policy regarding "new hires and new hires being given the store keys," Plaintiff initially testified that he could not recall what Defendant's policy was. *Id*. at 89. Later during the deposition, though, he blamed the decision, to give store keys to Strain before she underwent a background check, on his assistant manager, Larry. *Id*. at 97-99. Plaintiff admitted, however, that as Store Manager, he was ultimately responsible for Larry's mistake. *Id*. at 99. Plaintiff also agrees that the information contained in the PIP was accurate, though he claims that the

store's poor performance was the fault of his employees. *Id*. at 89-90. Yet, Plaintiff again acknowledged that he personally was ultimately responsible for "the problems" in his store. *Id*. at 92. Regarding the November 26, 2008 "Final Warning," Plaintiff agrees that the information contained therein, concerning his store's performance, was accurate, although he characterizes the document as being "vengeful." *Id*. at p. 110-111 ("You can tell this is a vengeful counseling."). Finally, as to the Loss Prevention Audit that Trepiccione conducted on December 22, 2008, Plaintiff testified that he has no reason to believe that Trepiccione's report was false. *Id*. at pp. 123-124.

Following the completion of discovery, Defendant filed the subject motion for summary judgment. On March 14, 2013, counsel for the parties appeared before the undersigned for oral argument.

ANALYSIS

*Rule 56*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to

support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), cert denied, 517 U.S. 1190 (1996). Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.

The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(c)(4). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted).

*Title VII, Section 1981 and the NYHRL*

Plaintiff brings this action under Title VII, which "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d 426, 436 (2d Cir. 1999)(citations omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199 (2nd Cir. 2006). The substantive legal principles for claims under Title VII also apply generally to claims under Section 1981 and the NYHRL. *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir.2010). Consequently, unless otherwise noted, references to Title VII below are also intended to refer to Section 1981 and the NYHRL.

*Hostile Environment*

Plaintiff maintains that Alfredo and Stayer created a hostile working environment. First, he contends that Alfredo created a hostile working environment by making daily comments about Plaintiff's ethnicity, and by sending Plaintiff the "I Kill U" text message. Second, he maintains that Stayer created a hostile environment by telling Alfredo, referring to Plaintiff, "Don't piss him off, they're crazy people." The legal standards for a hostile environment claim are well settled:

> In order to establish a hostile work environment claim ... a plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered. A hostile working environment is shown when the incidents of harassment occur either in concert or with a regularity that can reasonably be termed pervasive. The plaintiff must show more than a few isolated incidents ..., although a hostile work environment can also be established through evidence of a single incident of harassment that is extraordinarily severe.

*Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 723–724 (2d Cir.2010) (citations and internal quotation marks omitted); *see also, Fitzgerald v. Henderson*, 251

F.3d 345, 360 (2d Cir.2001) ("If a rational juror could infer that a reasonable employee would have viewed a given series of events as materially worsening her working conditions, summary judgment dismissing her hostile work environment claim on the ground of lack of an adverse employment decision is inappropriate."). In this regard, the Court must not "view individual incidents in isolation," or "view the record in piecemeal fashion," but instead, should consider the "totality of the circumstances, viewed from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances including the social context in which particular behavior occurs and is experienced by its target." *Redd v. New York Div. of Parole*, 678 F.3d 166, 176 (2d Cir.2012) (citations and internal quotation marks omitted).

In the instant case, it is doubtful that Plaintiff could establish, as part of his prima facie case, that the alleged harassment was sufficiently severe or pervasive.  At the outset, the alleged "crazy people" remark  by Stayer was a single "stray comment" that was unrelated to the alleged harassment by Alfredo.  In that regard, it appears that Stayer was in Plaintiff's store only infrequently, and that he had no knowledge of Alfredo's alleged daily comments about Plaintiff.  In other words, Stayer's alleged comment was not part of the same hostile environment that Plaintiff maintains was being created by Alfredo.  Moreover, it does not appear that Alfredo's alleged comments were sufficiently severe or pervasive, for the simple reason that Plaintiff did not do anything about them, even though, as Alfredo's supervisor, he could have done so.  However, the Court need not decide whether the alleged comments by Alfredo and Stayer were sufficiently severe or pervasive, since, even assuming *arguendo* that they were,  the harassment cannot be imputed to Defendant.

In that regard it is of course well settled that in addition to proving that the alleged

hostile environment was sufficiently severe and pervasive, the Plaintiff must also

establish a basis to impute the harassment to the employer:

> Where an employee is the victim of . . . harassment, including harassment
> in the form of a hostile work environment, by non-supervisory co-workers,
> an employer's vicarious liability depends on the plaintiff showing that the
> employer knew (or reasonably should have known) about the harassment
> but failed to take appropriate remedial action. According to two 1998
> Supreme Court cases, *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742,
> 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca
> Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), this inquiry
> differs where the harassment is attributed not to non-supervisory
> co-workers but to a supervisor with immediate or successively higher
> authority over the employee. *Burlington Indus.*, 524 U.S. at 765, 118 S.Ct.
> 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. In that circumstance, a
> court looks first to whether the supervisor's behavior culminated in a
> tangible employment action against the employee. If it did, the employer
> will, *ipso facto*, be vicariously liable. If no such tangible employment action
> is present, however, an employer will still be liable for a hostile work
> environment created by a supervisor unless the employer successfully
> establishes an affirmative defense. That defense requires the employer to
> show that (a) it exercised reasonable care to prevent and correct promptly
> any sexually harassing behavior, and (b) the plaintiff employee
> unreasonably failed to take advantage of any preventive or corrective
> opportunities provided by the employer or to avoid harm otherwise.

*Fairbrother v. Morrison*, 412 F.3d 39, 48–49 (2d Cir.2005) (citations and internal

quotation marks omitted), abrogated on other grounds by *Kessler v. Westchester County

Dept. of Soc. Servs.*, 461 F.3d 199 (2nd Cir.2006).10

---

10The *Faragher/Ellerth* defense does not apply to retaliation claims brought directly against the employer.
*See, Finnerty v. William H. Sadlier, Inc.*, 176 Fed.Appx. 158, 163 (2d Cir. Apr. 7, 2006) ("The
*Faragher/Ellerth* affirmative defense is about the extent to which an employee's misbehavior may be
attributed to his or her employer under principles of vicarious liability. It has no role in analyzing Sadlier's
direct liability to Finnerty for its own actions with respect to the [alleged retaliatory firing].").

Here, at the outset, it is obvious that Alfredo was not Plaintiff's supervisor. It is also clear from the record that Stayer was not Plaintiff's supervisor. On that point, Plaintiff concedes that Stayer had no authority to discipline him. *See*, Pl. Resp. to Def. Stmt. of Facts [#20-2] ¶ 14. At most, Stayer had the ability to issue negative inspection reports to Plaintiff's immediate supervisor, Pepe, which he did.11 However, Plaintiff has not offered any evidentiary proof in admissible form to challenge the contents of Stayer's reports.12 Furthermore, it is well settled that a negative performance evaluation by itself is not a "tangible employment action" within the meaning of the *Faragher/Ellerth* defense. *See, Pugni v. Reader's Digest Ass'n, Inc.*, No. 05 Civ. 8026(CM), 2007 WL 1087183 at *17 (S.D.N.Y. Apr. 9, 2007) ("[A] negative evaluation by itself is not a tangible employment action."); *Vazquez v. Southside United Housing Development Fund Corp.*, No. 06–CV–5997 (NGG)(LB), 2009 WL 2596490 at *16 (E.D.N.Y. Aug. 21, 2009) ("Ciprian also issued a total of three memoranda, roughly one per month, admonishing Vazquez for poor job performance, but Vazquez has conceded or at least failed to contest the accuracy of Ciprian's critiques. Further, it is questionable whether a poor performance review could qualify as a 'tangible employment action.'") (citation omitted). There is no indication here that Plaintiff suffered any tangible employment action as a direct result of Stayer's reports. Rather, the "last straw" that led to Plaintiff's firing was the report written by Trepiccione, not

---

11Apart from these observations, at oral argument Plaintiff's attorney agreed that Stayer was not Plaintiff's supervisor.

12To the contrary, Plaintiff makes only conclusory allegations that other store managers were not disciplined for the same problems that his store had, *see*, Pl. Aff. at ¶ ¶ 23, 26, and those contentions are belied by his prior sworn deposition testimony. *See*, Pl. Dep. at p. 137-139, 143, 147-149, 176-177.

Stayer. Accordingly, for purposes of *Faragher/Ellerth*, the Court finds that Alfredo and Stayer were Plaintiff's co-workers, not his supervisors, and that even if Stayer was Plaintiff's supervisor, he did not take any tangible adverse employment action against Plaintiff.

Having made that determination, the Court further finds, as a matter of law, that Defendant took reasonable care to prevent harassment, but that Plaintiff unreasonably failed to take advantage of Defendant's anti-harassment procedures. Such is clearly the case as to the alleged daily harassment by Alfredo, and the alleged "crazy people" comment by Stayer, since Plaintiff admits that he never reported such harassment to anyone. At most, Plaintiff contends that he "reported" Alfredo's "I Kill U" text message to Stayer. However, merely showing a text message to a co-worker is not the equivalent of reporting harassment. In that regard, there is no indication that Plaintiff characterized the text message as harassment to Stayer, or that he asked Stayer to do anything about it. Instead, Plaintiff merely complained to Stayer that it was unfair that people would find the text message funny coming from Alfredo, but might find it threatening if he had sent it, presumably alluding to his Middle Eastern heritage.

In any event, Plaintiff unreasonably failed to follow the reporting procedures that were clearly spelled out in Defendant's policies. Notably in that regard, Stayer was not one of the group of persons who were designated by those policies to receive harassment complaints. On that point, Plaintiff indicates that he made a conscious decision not to follow Defendant's policies, since he subjectively felt that it would be futile. *See*, Pl. Dep. [#14-2] at 47 (Explaining why he did not contact Carnecchia: "I started feeling a hostile environment all around. I'm not going to get the help I'm

looking for."). Having made that decision without any reasonable justification, Plaintiff cannot now impose liability on Defendant for the alleged hostile environment discrimination.

*Retaliation*

Plaintiff also maintains that he suffered two types of retaliation: First, he contends that he suffered retaliation in the form of negative performance reviews after he reported Rodriguez's complaint of sexual harassment to Defendant; and second, he alleges that he suffered retaliation in the form of termination after he filed his first EEOC complaint. The legal principles for retaliation claims are clear:

> "Retaliation claims under Title VII are evaluated under a three-step burden-shifting analysis." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.2005); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff must establish a prima facie case of retaliation by showing: " '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action;13 and (4) a causal connection between the protected activity and the adverse employment action.' " *Jute*, 420 F.3d at 173 (*quoting McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir.2001)). The plaintiff's burden in this regard is " de minimis," and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Id*. (internal quotation marks omitted).

> If the plaintiff sustains this initial burden, "a presumption of retaliation arises." *Id*. The defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id*. If so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id*. A plaintiff can sustain this burden by proving that "a retaliatory motive

_____

13To make a prima facie showing of an adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d at 207 (*quoting Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006)).

played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).

*Hicks v. Baines*, 593 F.3d 159, 164-165 (2d Cir. 2010).

### *The alleged retaliation for reporting Rodriguez's complaint of harassment*

Plaintiff cannot establish a prima facie claim on this point, since he did not engage in protected activity. It is well settled that "[t]he term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d cir. 2000). In deciding whether a particular activity amounts to "protected activity," "the employment practices opposed by the plaintiff need not have actually amounted to a violation of Title VII. Rather, the plaintiff must have had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001). "[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's [complaint] was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v. National Realty & Development Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).

Plaintiff did not engage in protected activity when he reported Rodriguez's complaint, since a supervisor's involvement, *as part of his routine job duties*, in reporting or investigating incidents of harassment between employees under his supervision does not qualify as protected activity. *See, Ezuma v. City Univ. of New York*, 665 F.Supp.2d 116, 122-124 (E.D.N.Y. 2009) ("[I]f an academic chairperson is

26

required as part of his job to report incidents of sexual harassment that come to his attention, as is the case here, the mere performance of that function is not "opposition" to his employer and does not constitute protected activity."); *id*. at 129 ("[P]laintiff must oppose discrimination, rather than simply report it as part of his job, to have a retaliation claim."), *aff'd*, 367 Fed.Appx. 178 (2d Cir. Feb. 22, 2010) (table); *see also, Adams v. Northstar Location Servs., LLC*, No. 09–CV–1063–JTC, 2010 WL 3911415 at *4 (W.D.N.Y. Oct. 5, 2010) ("[P]laintiff's actions in investigating the complaint of race-based harassment would not constitute protected activity, as plaintiff was acting in the scope of her employment as a human resources director by interviewing the witnesses to the incident.").

Even assuming *arguendo* that Plaintiff engaged in protected activity with regard to Rodriguez's complaint, he cannot show that his subsequent negative performance evaluations were causally related to such activity. In that regard, Plaintiff states:

> After initially reporting [Rodriguez's] complaint of sexual harassment against Mr. Caccamise, the way management, in particular Mr. Stayer and David Pepe, the District Team Leader, treated me changed dramatically. I was singled out for retaliatory treatment and subject to progressive discipline.

Pl. Aff. at ¶ ¶ 21-22. However, Plaintiff's claim that he was "singled out" has no support. In that regard, it is well-settled that "[a] party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory." *Katel Ltd. Liability Co. v. AT & T Corp.*, 607 F.3d 60, 67 (2d Cir. 2010) (*quoting Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 310 (2d Cir. 2008)). Moreover, it is well settled that the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that

disputes his own prior sworn testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996) (citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987) (citations omitted).  In this case, Plaintiff alleges that in two instances, he was singled-out for discipline when other similarly situated store managers were not. *See*, Pl. Resp. to Def. Stmt. of Facts [#20-2] ¶ ¶ 50 & 53, citing to ¶ ¶ 23 & 26 of his affidavit [#20-1].  However, not only are those contentions conclusory and unsupported by any evidentiary proof in admissible form, they are also contradicted by Plaintiff's prior sworn deposition testimony, in which he indicated that he had no firsthand knowledge about the other stores. *See*, Sarkis Dep. [#14-2] at p. 137.  Specifically, at deposition, Plaintiff testified as follows:

> Q. Do you have any knowledge about any disciplinary action concerning any other Store Team Leader during your employment with Ollies?
>
> A. No.
>
> Q. Do you have any first-hand knowledge regarding any personnel decisions concerning any other Store Team Leaders during your employment with Ollies?
>
> A. No.

Pl. Dep. at p. 149.

Moreover, as discussed at length above, Plaintiff had already failed several Loss Prevention Audits before the alleged report of sexual harassment against Rodriguez came up in June 2008.  Additionally, the evaluations of Plaintiff's performance essentially remained consistent throughout his tenure, which is to say that the evaluations were generally as bad before he reported the sexual harassment as they were after.  Furthermore, as discussed above, Plaintiff has not offered any evidence to

28

disprove the accuracy of the disciplinary reports that were issued to him to him both before and after June 2008.  Accordingly, Plaintiff cannot show a causal nexus between the alleged protected activity involving Rodriguez and the alleged retaliatory treatment.  For the same reasons, even if Plaintiff could somehow establish a prima facie case of retaliation arising from the Rodriguez incident, he could not show that Defendant's proffered non-discriminatory reasons are false and/or pretextual.

### *The alleged retaliation for filing his first EEOC complaint*

The filing of an EEOC complaint is protected activity, and Plaintiff contends that the termination of his employment only two months later must, because of the temporal proximity, have been causally related.  However, temporal proximity between the filing of an EEOC complaint and an employee's termination does not establish a causal nexus when the employee was already facing discipline for poor performance at the time he filed the EEOC complaint. *See, Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("[I]n this case the adverse employment actions were both part, and the ultimate product, of an extensive period of progressive discipline which began when Swiss Re diminished Slattery's job responsibilities a full five months prior to his filing of the EEOC charges.  Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.") (internal quotation marks omitted); *Nicastro v. New York City Dept. of Design and Const.*, 125 Fed.Appx. 357, 358, 2005 WL 590167 at *1 (2d Cir. Mar. 14, 2005) ("[W]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of

29

retaliation does not arise[.]") (citing *Slattery*).

In this case, Plaintiff filed his EEOC complaint just three days after he received a failing 44% score on his overall store audit, and after failing consecutive Loss Prevention Audits in March, April, June, July and October. Although Plaintiff was terminated just two months after filing his EEOC complaint, the poor job performance for which he was purportedly terminated was already well-documented prior to his EEOC complaint. In fact, Plaintiff swears that he was issued a "final warning" on October 18, 2008, which was nine days before he filed his EEOC complaint on October 27, 2008. *See*, Sarkis Aff. [#20-1] ¶ 26. Accordingly, the Court finds that here, temporal proximity alone does not establish a prima facie showing of causal nexus.

However, even assuming *arguendo* that Plaintiff could rely on temporal proximity to establish his prima facie case, Defendant has proffered a legitimate non-discriminatory reason for terminating Plaintiff's employment, namely, his poor performance as a store manager, which includes the fact that he consistently failed his Loss Prevention audits and failed to remedy the problems identified by the Safety Audits of his store. For the reasons already discussed above, Plaintiff cannot show that Defendant's proffered reasons are false or that Defendant was actually motivated by retaliatory animus.

CONCLUSION

Defendant's application for summary judgment [#14] is granted and this action

is dismissed. The Clerk of the Court is directed to close this action.

SO ORDERED.

Dated: Rochester, New York
        March 26, 2013

                                    ENTER:


                                    /s/ Charles J. Siragusa
                                    CHARLES J. SIRAGUSA
                                    United States District Judge